**Rodman ATKINS, Plaintiff,**

v.

**BOARD OF SCHOOL COMMISSIONERS OF the CITY OF INDIANAPOLIS, James A. Adams, Rodney M. Black, and Lorenzo Davis, Defendants.**

No. IP 92–120 C.

United States District Court,
S.D. Indiana,
Indianapolis Division.

June 21, 1993.

John O. Moss, Moss & Walton, Indianapolis, IN, for plaintiff.

Donald L. Dawson, Robert M. Kelso, Kightlinger & Gray, Indianapolis, IN, for defendants.

ENTRY

BARKER, District Judge.

Rodman Atkins ("Atkins") was a school bus driver for the Indianapolis Public Schools ("IPS") until he was discharged in 1990 for allegedly refusing to take a drug test. Atkins, who is an African–American, believes that his discharge was discriminatory, and has filed a multi-count complaint against the Defendants seeking declaratory judgment, injunctive relief and damages. Defendants move the Court to enter summary judgment in their favor. Defendants also move the Court to strike portions of Atkins's affidavit, exhibits attached to his brief in response to the Defendants' motion for summary judgment, and the affidavit of Judith K. Pennington. Atkins in turn moves the Court to strike portions of Dr. James Adams's ("Adams") affidavit. For reasons that will be explained below, the Defendants' motion for summary judgment is granted in part and denied in part. The Defendants' motion to strike portions of Atkins's affidavit and the exhibits attached to his response brief is granted, and the motion to strike the affidavit of Judith K. Pennington is denied. Atkins's motion to strike the affidavit of Adams is denied.

I. BACKGROUND

At the time that this action was commenced, Adams was the Superintendent of IPS, Rodney M. Black ("Black") was the Manager of the IPS Business Department, and Lorenzo Davis ("Davis") was Assistant Supervisor of the IPS Transportation Department. IPS hired Atkins on August 11, 1980 as an extra-curricular bus driver. He was terminated by the Board of School Commissioners ("Board") on March 20, 1990, after Adams recommended to the Board that he be relieved of his duties for refusing to take a drug test. This action was taken following Adams's review of Atkins's tenure with IPS, which revealed several complaints concerning his alleged drug use and being intoxicated while on duty. In 1988, IPS received four unsolicited complaints against Atkins. On one occasion, someone reported

that Atkins had been seen smoking marijuana and drinking alcohol in a car parked across the street from the main school bus depot. On another occasion, two teachers and a parent complained to IPS that Atkins was under the influence of drugs or alcohol while he drove students on a field trip to Noblesville.

On February 8, 1990, Adams received another complaint about Atkins's alleged drug use, which prompted IPS to request that he submit to drug testing. Atkins allegedly refused to cooperate. On February 12, 1990, Davis sent a letter to Atkins advising him that he would recommend to Adams that his employment be terminated for refusing to take a drug test. *See* Defendant's Exhibit O. IPS sent Atkins a copy of this letter by certified mail to the home address which he furnished to the IPS personnel department; Atkins's father, Charles Atkins, signed for the letter on February 14, 1990. *See* Defendant's Exhibit P. Adams then sent a certified letter to Atkins two days later advising him that he would recommend to the Board that IPS terminate his employment for the reasons given in Davis's letter, *see* Defendant's Exhibit Q; the letter was sent to the same address, and again Atkins's father signed for it. *See* Defendant's Exhibit R. Adams's letter specifically advised Atkins that if he desired a hearing before the Board, he was required to file his request within ten days. *See* Defendant's Exhibit Q. Plaintiff filed a request for a hearing on March 6, 1990, more than ten days after the receipt of service had been signed. *See* Defendant's Exhibit S. Predictably, the request was denied as untimely.

The Board terminated Atkins's employment with IPS on March 20, 1990. Soon thereafter Plaintiff sent the Board a letter requesting that it reconsider its decision denying his demand for a hearing because his father had not given him the letter until February 26, 1990. *See* Defendant's Exhibit U. Adams denied this request on April 18, 1990. *See* Defendant's Exhibit V.

Having failed to regain his position through persuasion, Atkins resorted to litigation. He filed a "Charge of Discrimination" with the Equal Opportunity Commission

("EEOC") on August 3, 1990, which he amended on February 7, 1991. The EEOC granted him permission to sue on November 27, 1991, and he filed his complaint with this Court on January 31, 1992. The complaint contains six counts: Count I alleges that the Defendants unlawfully terminated Atkins's employment because of his race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981 (as amended by the Civil Rights Act of 1991); Count II alleges that the Indianapolis Board of School Commissioners ("Board") denied Atkins a pre-termination hearing, in violation of his right to due process and equal protection; Count III alleges that Adams deprived Atkins of liberty and property by terminating him from his employment because of his race, deprived him of equal protection by retaliating against him for refusing to take a drug test, and breached his contract of employment; Count IV alleges that Black recommended to the Indianapolis Board of School Commissioners that he be terminated from his employment, and thereby violated Atkins's right to due process and equal protection; Count V alleges that Davis recommended to the Indianapolis Board of School Commissioners that he be terminated from his employment, violating Atkins's right to due process; and Count VI alleges that the Defendants' terminated his employment for attempting to enforce rights protected by the First, Fifth, and Fourteenth Amendments to the United States Constitution. Atkins seeks full reinstatement, an injunction preventing the Defendants from discriminating against him, compensatory and punitive damages, and costs and attorney fees.

In their answer, the Defendants deny Atkins's allegations and invoke the affirmative defenses of: (1) good faith; (2) unclean hands (*i.e.* Atkins's discharge was proper because he breached his employment contract); (3) failure to state a claim under 42 U.S.C. § 1981, and the Civil Rights Act of 1991; (4) failure to exhaust administrative remedies; (5) lack of evidence (*i.e.* Atkins's discharge was for legitimate business reasons and not on account of race or sex); and (6) immunity.

## II. DISCUSSION

### A. *Summary Judgment Standards*

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ. Proc. 56(c). While the burden rests squarely on the party moving for summary judgment to show "that there is an absence of evidence to support the nonmoving party's case", *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986), the nonmoving party responding to a properly made and supported summary judgment motion still must set forth facts showing that there is a genuine issue of material fact and that a reasonable jury could return a verdict in its favor. *See Wolf v. City of Fitchburg*, 870 F.2d 1327, 1329 (7th Cir.1989); *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir. 1983), *cert. denied*, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). Denials contained in the pleadings or bald allegations that an issue of fact exists is insufficient to raise a factual issue. *See Shacket v. Philko Aviation, Inc.*, 681 F.2d 506, 513 n. 8 (7th Cir.1982), *rev'd on other grounds*, 462 U.S. 406, 103 S.Ct. 2476, 76 L.Ed.2d 678 (1983). "The moving party is 'entitled to a judgment as a matter of law' [if] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). If doubts remain, however, as to the existence of a material fact, then those doubts should be resolved in favor of the nonmoving party and summary judgment denied. *See Wolf*, 870 F.2d at 1330. The Seventh Circuit Court of Appeals has described the application of these principles in the context of Title VII litigation:

> In Title VII cases, we approach the application of these principles with a special caution. Summary judgment is infrequently an appropriate resolution. The factual issues presented in such litigation, including the issue of discriminatory intent which is often proven by circumstantial evidence, cannot often be resolved on summary judgment. However, even when such issues of motive or intent are at stake, summary judgment is proper "where the plaintiff presents no indications of motive and intent supportive of his position."

*Powers v. Dole*, 782 F.2d 689, 694 (7th Cir. 1986) (citations omitted).

### B. *Atkins's Claims*

#### 1. Count I: Title VII and § 1981 Claims as to All Defendants

■ Count I sets forth claims under Title VII, 42 U.S.C. § 2000e, and 42 U.S.C. § 1981 (as amended by the Civil Rights Act of 1991) against all the Defendants. The latter claim can be easily disposed of because discriminatory discharges are not actionable under 42 U.S.C. § 1981. *See McKnight v. General Motors Corp.*, 908 F.2d 104, 108–109 (7th Cir.1990), *cert. denied*, 499 U.S. 919, 111 S.Ct. 1306, 113 L.Ed.2d 241 (1991). Nor does the Civil Rights Act of 1991 have any bearing on this matter because the Seventh Circuit has held that it does not apply retroactively. *See Luddington v. Indiana Bell Telephone Co.*, 966 F.2d 225 (7th Cir.1992); *Mozee v. American Commercial Marine Service Co.*, 963 F.2d 929 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 207, 121 L.Ed.2d 148 (1992). The Title VII claim requires further analysis.

#### a. *Title VII Burdens*

■ Title VII makes it unlawful "for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race ... [or] sex...." 42 U.S.C. § 2000e–2(a)(1). A plaintiff alleging disparate treatment in violation of Title VII must establish that she has been the victim of intentional discrimination, *see Friedel v. City of Madison*, 832 F.2d 965, 971–72 (7th Cir.1987), which she can do in two different ways: (1) by offering direct proof of discrimination, *see Price Waterhouse*

*v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), or (2) by relying on indirect evidence using the *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), burden-shifting method of proof. *See Bruno v. City of Crown Point,* 950 F.2d 355, 361 (7th Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 2998, 120 L.Ed.2d 874 (1992). In *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Supreme Court described the latter framework as follows:

> In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), we set forth the basic allocation of burdens and order of presentation of proof in a Title VII case alleging discriminatory treatment. (footnote omitted). First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.,* at 802, 93 S.Ct. at 1824. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Id.,* at 804, 93 S.Ct. at 1825.

*Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093.

■ To establish a prima facie case of disparate treatment based on race or gender, the plaintiff must present facts which show that: (1) he is a member of the protected class, (2) he conducted himself in a manner consistent with his employer's legitimate business expectations, (3) he suffered from an adverse employment action, and (4) similarly situated employees who were not members of the protected class were treated more favorably. *See Kizer v. Children's Learning Center,* 962 F.2d 608, 611–12 (7th Cir.1992); *Williams v. Williams Electronics, Inc.,* 856 F.2d 920, 923 (7th Cir.1988). If the plaintiff is unable to establish any one of these elements, then summary judgment in favor of

the employer is proper. *See Reed v. Amax Coal, Co.,* 971 F.2d 1295, 1299 (7th Cir.1992).

■ If the employer is able to articulate a legitimate, nondiscriminatory reason for the discharge, the next burden the plaintiff bears is to show that the employer's stated reasons are pretextual. To do this, the plaintiff must establish that he or she has been the victim of *intentional* discrimination. *See Friedel,* 832 F.2d at 972, *citing, Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 875, 104 S.Ct. 2794, 2799, 81 L.Ed.2d 718 (1984). This showing may be made in one of two ways: "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. No matter which showing is made, "[t]his burden ... merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Id.; see also Price Waterhouse, supra.*

■ In addition, the employee ultimately must show that the employer's discriminatory intent was the "but for" cause of the adverse action. *See Williams,* 856 F.2d at 923. Under the "but for" standard of causation:

> [I]t is not enough for an employee to show that an employer harbored some discriminatory motivation. Rather, the employee must establish that the discriminatory motivation was a determining factor in the challenged employment decision in that the employee would have received the job absent the discriminatory motivation.

*McQuillen v. Wisconsin Education Association Council,* 830 F.2d 659, 664 (7th Cir. 1987), *cert. denied,* 485 U.S. 914, 108 S.Ct. 1068, 99 L.Ed.2d 248 (1988).

### b. Atkins's Prima Facie Case

Atkins definitely can establish two of the four elements needed to make out a prima facie case of race or gender discrimination. It is undisputed that he is a member of a protected class and that he has suffered an adverse employment action (*i.e.* he has been discharged from his job). The remaining two

elements are more formidable obstacles to his cause, however. First, Atkins contends that he conducted himself in a manner consistent with IPS's legitimate business expectations because, in his view, IPS had no right to make his employment contingent on his willingness to submit to drug testing. IPS argues that its employment contract with Atkins gives it the right to test him for drugs, and that both the Indiana Code and recent U.S. Supreme Court holdings permit such tests in circumstances that are present in this case. Second, Atkins claims that similarly situated white IPS employees and female bus drivers who were accused of drug or alcohol abuse were not required to submit to drug testing and were not terminated from their employment as he was. IPS argues that Atkins has absolutely no evidence to substantiate his disparate treatment claims.

### (1) Atkins's Challenge to IPS's Request that He Submit to Drug Testing

Atkins claims that IPS's request that he take a drug test is "unlawful", *see* Plaintiff's Contentions, at ¶ 3(d), and, given this fact, he apparently believes that drug testing is not a legitimate business expectation which IPS should impose on its bus drivers. In resolving this claim, the Court also must decide concurrently whether IPS has articulated a legitimate nondiscriminatory reason for his discharge because both inquiries center on the propriety of IPS's demand that Atkins submit to a drug test. The facts of this case are such that the second inquiry, which normally would begin once Atkins had established his prima facie case, collapses into the first, or that part of the plaintiff's prima facie case concerning the employer's legitimate business expectations.

The Defendants are correct in stating that Atkins entered into an employment contract with IPS. *See* Plaintiff's Exhibit Z. The contract specifically states that Atkins is required to submit to a physical examination whenever IPS so requests, and that failure to comply is grounds for dismissal:

6. Employer may, at any time, require any Driver to submit to an additional physical examination by a licensed Indiana Physician selected by the Employer. Employer shall pay the cost of additional physical examinations required as set out in Acts 1973, Public Law 218, Article 9.1., Chapter 3, Section 4 [I.C. 20–9.1–3–4]. . . .

12. It is specifically agreed that the provisions in Acts 1973, Public Law 218, Article 9.1, as same may be amended, and as same apply to school bus drivers, are made a part of this contract, and it is the intention of the parties thereto to enter into a valid and binding contract subject to the Public Transportation Code (Acts 1973, Public Law 218, Article 9.1), the provisions of which shall prevail over any part of this contract determined to conflict therewith . . .

14. Failure on the part of the Driver to comply with the terms of this contract shall be deemed cause for dismissal at the option of the Employer.

Defendants' Exhibit Z; Affidavit of James A. Adams, ¶ 16. Defendants point out that Indiana law, as cited in the contract, authorizes a school corporation to require its school bus drivers to submit to physical examinations whenever the school corporation requests. The relevant provision provides:

20–9.1–3–4. School bus drivers—Additional physical examinations.—A governing body, may, at any time, require any driver operating a school bus for its school corporation to submit to a physical examination by a licensed Indiana physician selected by the corporation. The school corporation shall pay the cost of an examination under this section.

Ind.Code 20–9.1–3–4 (Burns 1992). Although this section does not specifically mention drug testing, when read in conjunction with the statutorily defined standards for school bus drivers, the legislature's intent to provide the option of including drug testing as part of the physical examination is readily apparent. *See, e.g., K–Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291, 108 S.Ct. 1811, 1818, 100 L.Ed.2d 313 (1988) ("In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole."); *Illinois E.P.A. v.*

*U.S. E.P.A.,* 947 F.2d 283, 289 (7th Cir.1991). Section 20–9.1–3–1 states:

> **School bus drivers—Standards.**—A person may not drive a school bus for the transportation of school children unless the person:
>
> (a) Is of good moral character;
>
> (b) Does not use intoxicating liquor during school hours;
>
> (c) Does not use intoxicating liquor to excess at any time;
>
> (d) Is not addicted to any narcotic drug;
>
> (e) Is at least twenty-one (21) years of age;
>
> (f) Holds a valid public passenger chauffeur's license issued by the state of Indiana or any other state; and
>
> (g) Possesses the following required physical characteristics:
>
> > (1) Sufficient physical ability to drive a school bus;
> >
> > (2) Possession and full normal use of both hands; both arms, both feet, both legs, both eyes and both ears;
> >
> > (3) Freedom from any communicable disease;
> >
> > (4) Freedom from any mental, nervous, organic or functional disease;
> >
> > (5) Visual acuity, with or without glasses, of at least 20/40 in each eye and a field of vision with 150 degree minimum and with depth perception of at least 80%.

Ind.Code 20–9.1–3–1 (Burns 1992). The objective of these standards is to ensure that school bus drivers in Indiana have the present ability to perform their duties and thereby provide children with safe transportation to and from school. In the same way, Section 20–9.1–3–1.6(b) provides criminal penalties for drivers who operate a school bus under the influence of drugs or alcohol: "(b) A person who is a school bus driver and who knowingly and intentionally: (1) Consumes a controlled substance or intoxicating liquor within six (6) hours before: (A) Going on duty; or (B) Operating a school bus; or (2) Consumes or possesses a controlled substance or intoxicating liquor commits a Class A misdemeanor." Ind.Code § 20–9.1–3–1.6 (Burns 1992).

The importance of Section 20–9.1–3–4 to the regulatory scheme for school bus drivers is readily apparent: it allows school authorities to enforce the standards which the legislature created. Suspicion that a particular driver is not fit to carry-out his or her duties need not wait confirmation through a disaster or the next scheduled physical exam. For the safety of Indiana's children, school authorities may at any time demand that a driver submit to a physical exam. *See* Ind. Code § 20–9.1–3–4. That this exam may include investigation for drug use, including a urinalysis, is apparent in the standards themselves: limitations on drug and alcohol use are listed along with a host of performance related physical requirements. *See* Ind.Code § 20–9.1–3–1.

The testing of school bus drivers for drugs, even without suspicion, is not subject to constitutional attack. The United States Supreme Court has upheld the constitutionality of suspicionless drug testing laws provided that the state is able to articulate "special needs" for the search.[1] *See Skinner v. Railway Labor Executives Association,* 489 U.S. 602, 619–20, 626–27, 109 S.Ct. 1402, 1414–15, 1418–19, 103 L.Ed.2d 639 (1989); *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). Guaranteeing the sobriety of school bus drivers is such a "special need." *See Jones v. Jenkins,* 878 F.2d 1476 (D.C.Cir. 1989). That IPS waited until it had a suspicion that Atkins was using drugs does not negate the validity of its enforcement action in this case. Atkins's criticisms of IPS's attempted execution of its contractual rights is meritless. School districts in Indiana have a legitimate expectation that their bus drivers will submit to drug testing when, as here, the employment contract incorporates the aforementioned Indiana statute and includes a requirement providing for unscheduled

---

1. The Supreme Court specifically noted the diminished intrusion on the employee's privacy interest when the urinalysis is collected in a "medical environment" using "procedures encountered often in the context of a regular physical examination." *Skinner,* 489 U.S. at 626–27, 109 S.Ct. at 1418–19.

physical exams.[2] *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824.

The Court can also say that IPS has articulated a legitimate, nondiscriminatory reason for Atkins's termination: "he refused to submit to a drug test."[3] Whether in fact he refused is not significant at this stage of the analysis; the reason itself is legitimate and non-discriminatory.

(2) Atkins Claim of Disparate Treatment

Besides challenging the legal foundations of IPS's decision to test its bus drivers for drugs, Atkins also claims that IPS's request that he submit to testing was discriminatory. *See, e.g., Yick Wo v. Hopkins,* 118 U.S. 356, 363, 6 S.Ct. 1064, 1068, 30 L.Ed. 220 (1886) (finding violation of equal protection in discriminatory application of facially neutral law). Specifically, he believes that similarly situated white or female IPS employees were treated more favorably in that they were not asked to undergo drug testing even though IPS was aware of, or suspected, their drug abuse, and, unlike him, IPS did not terminate their employment. Atkins presents the Court with his own affidavit to support these charges. Because the Defendants have filed a motion to strike part of the affidavit, including many of the statements that Atkins relies on to support his discrimination charges, the Court will address the merits of that motion before deciding whether a genuine issue remains for the jury to resolve as concerns IPS's alleged disparate treatment of Atkins.

*(a) Defendants' Motion to Strike Atkins's Evidence of Disparate Treatment*

■ Defendants move the Court pursuant to Fed.R.Civ.Proc. 56(e) to strike paragraphs 6, 8–12, and 17–19 of Atkins' Affidavit, and Exhibits "A" through "F" attached to Plaintiff's Response to Defendants' Motion for Summary Judgment. Rule 56(e) states:

"Form of Affidavits; Further Testimony; Defense Required. Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." As the language of the Rule plainly indicates, the requirement of personal knowledge is mandatory. *See Toro Co. v. Krouse, Kern & Co., Inc.,* 827 F.2d 155, 162 n. 3 (7th Cir. 1987). The facts presented in the affidavit also must be admissible evidence. "[T]he policy of Rule 56(e) is to allow the affidavit to contain evidentiary matter, which, if the affiant were in court and testifying on the witness stand, would be admissible as part of his testimony." *Pfeil v. Rogers,* 757 F.2d 850, 860 (7th Cir.1985), *cert. denied,* 475 U.S. 1107, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986), *citing,* 6 Moore's Federal Practice, § 56.22[1] at 1321–22 (1982); *see also Randle v. LaSalle Telecommunications, Inc.,* 876 F.2d 563, 570 n. 4 (7th Cir.1989) ("Rule 56(e) requires that evidentiary affidavits 'shall set forth facts as would be admissible in evidence.' Based on this requirement, our cases have stressed that we are unable to consider hearsay statements that are not otherwise admissible at trial.").

Applying these standards, the Court finds that paragraphs 6, 10, 12, 18 and 19 of Atkins's affidavit are based on information and belief and not on personal knowledge, and paragraphs 8, 9, 11, and 17 are hearsay statements not subject to any exception under the Federal Rules of Evidence. Exhibits "A" through "F" attached to Plaintiff's Response to Defendants' Motion for Summary Judgment also must be stricken because they are not referenced in Atkins's affidavit and have not otherwise been authenticated. They consequently are inadmissible hearsay. *See Martz v. Labor Life Insurance Co.,* 757 F.2d 135, 138 (7th Cir.1985).

---

**2.** Atkins is inconsistent concerning whether he in fact refused to take a drug test. Whether he agreed to take the drug test or not has no effect on the result which the Court reaches concerning his Title VII claims; Atkins has failed to demonstrate that similarly situated employees who were not members of the protected class were treated more favorably. *See infra; see generally Kizer,* 962 F.2d at 611–12.

**3.** Atkins asks the Court to decide whether a urinalysis alone constitutes a physical exam. The Court need not resolve this issue because it is not ripe for adjudication. Atkins never tendered a urine sample for analysis.

**1178**

The Defendants also move the Court to strike the affidavit of Judith K. Pennington because they believe that the affidavit was filed in an untimely manner. The Court denies the motion in light of the Court's order of December 23, 1992 regarding trial preparation deadlines.

### (b) Atkins's Evidence of Disparate Treatment

■ Having granted Defendants' motion to strike portions of Atkins's affidavit, the Court is unable to identify any evidence which creates a genuine issue for trial concerning whether similarly situated white or female employees were treated more favorably than Atkins. *See Kizer, supra; Williams, supra; see also* Exhibits attached to Defendant's Reply Brief in Support of Motion for Summary Judgment. Atkins has failed to make out a prima facie case of discrimination under Title VII. Count I is dismissed.[4]

### 2. Count II: Denial of Due Process and Equal Protection as to the Board

■ Count II alleges that the Indianapolis Board of School Commissioners denied Atkins a pre-termination hearing in violation of his right to procedural due process and equal protection under the Fourteenth Amendment. The Court has already recounted the relevant facts surrounding Atkins not being afforded a hearing, *supra*, and will not repeat them here, suffice it to say that Adams sent Atkins a certified letter on February 16, 1990, informing him that he had ten days from the receipt of the letter to provide notification to IPS that he wanted a formal hearing. Atkins claims that he did not receive the letter from his father until February 26, 1990, and that he provided notification within ten days from that date.

■ A due process claim must be based on a violation of a protected liberty or property interest. *See Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). Atkins therefore must demonstrate that he had a constitutionally protected property interest and that he was deprived of that interest without adequate due process of law by individuals acting under color of state law. *See Panozzo v. Rhoads,* 905 F.2d 135, 138 (7th Cir.1990). A public employee hired pursuant to an employment contract has a property interest in his continued employment which is safeguarded by due process of law during the term of the contract. *See Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 576–77, 92 S.Ct. 2701, 2708–09, 33 L.Ed.2d 548 (1972), *citing, Wieman v. Updegraff,* 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952); *see also Birdsell v. Litchfield Board of Fire & Police Commissioners,* 854 F.2d 204, 208 (7th Cir.1988) ("The Supreme Court has recognized that the property interest that is implicated when a public employer terminates an employee with legitimate expectations of job security is an especially weighty one."). The Court will assume *arguendo* that Atkins had a property interest in his employment with IPS based on the "School Bus Driver's Employment Contract". *See* Defendants' Exhibit Z.

■ An employee who possesses a property interest in his job must be given notice and an opportunity to be heard prior to dismissal. *See Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 547, 105 S.Ct. 1487, 1496, 84 L.Ed.2d 494 (1985). "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cen-*

---

4. The outcome would be the same in a pretext analysis. Assuming *arguendo* that Atkins had made out a prima facie case of discrimination, and having shown that IPS has articulated a legitimate, nondiscriminatory reason for his discharge, Atkins would carry the burden of showing that IPS's stated reason for his discharge is nothing more than a pretext. The Court has already pointed out the deficiencies in Atkins's evidence, however. *See supra.* Because he has not produced evidence sufficient to create a genuine issue for trial concerning whether a discriminatory reason more likely motivated IPS's decision to discharge him, or that IPS's proffered explanation is unworthy of credence, *see Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095, the Court would still have to grant summary judgment in favor of the Defendants on Atkins's discrimination claims.

*tral Hanover Bank & Trust Co.*, 339 U.S. 306, 314–15, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). In general, "[t]he notice must afford a reasonable time for those interested to make their appearance." *Id.*, at 314, 70 S.Ct. at 657. In identifying the minimum requirements of due process,[5] the Supreme Court balances public and private interests according to the framework which it established in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

> [O]ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 334–35, 96 S.Ct. at 903. The same balancing approach applies to evaluations of the adequacy of the notice. *See Birdsell*, 854 F.2d at 207.

Applying the *Mathews* factors to this matter, the Court has already identified the interest which Atkins has at stake; the Court will assume for purposes of this argument that he has a property interest in his employment. The second prong of the *Mathews* test requires the Court to focus on two considerations: (1) the risk that the Board's current notice practices would erroneously deprive Atkins's of his employment, and (2) the value of additional notice procedures.

After Adams had decided to recommend to the Board that Atkins's employment with IPS be terminated, he sent a letter via certified mail to the home address which Atkins provided to the IPS personnel department.[6] This is not a situation, therefore, where IPS threw its notice to the wind in hopes that it would land at Atkins's feet. It first searched its employment records to locate the address which Atkins provided for purposes, such as the one here, where correspondence through the mails was necessary. To ensure the letter's delivery, IPS took the additional precaution of sending it via certified mail, and has produced the return receipt as proof that the letter reached Atkins's home. *See* Defendant's Exhibit R. Atkins's father signed for the notice when it was delivered.

Thus, the procedures which IPS employed, while not eliminating the risk that Atkins would not receive notice of the opportunity for a hearing, ensured at a minimum that notice would reach the forwarding address which he left on file with the personnel department. The use of substitute procedures, such as providing hand delivery of the notice or telephoning the employee soon after scheduled delivery is to occur to confirm receipt, would reduce the risk of an erroneous deprivation only marginally since these procedures would matter only in the limited circumstance where the employee had absented himself from the address for more than the time required to respond. The time given to Atkins to request a hearing, ten

5. Abbreviated pre-termination processes are permissible provided that the employee is afforded the advantages of full post-deprivation procedures. *See Panozzo v. Rhoads*, 905 F.2d 135, 138 (7th Cir.1990), *citing, Loudermill*, 470 U.S. at 546, 105 S.Ct. at 1495. The Seventh Circuit Court of Appeals has noted:

> [a] public agency can fire an employee on the basis of notice ... and a probable-cause hearing provided it offers him a full hearing afterward. Only if there is no provision for a post-termination hearing must the pre-termination hearing provide all the procedural safeguards to which due process entitles a tenured public employee.

*Vukadinovich v. Board of School Trustees of Michigan City Area Schools*, 978 F.2d 403, 411 (7th Cir.1992), *citing, Swank v. Smart*, 898 F.2d 1247, 1256 (7th Cir.1990), *cert. denied*, 498 U.S. 853, 111 S.Ct. 147, 112 L.Ed.2d 113 (1990) (citations omitted). The collective bargaining agreement between IPS and Local 661, which was incorporated into Atkins's employment contract with IPS, provided Atkins with adequate post-deprivation remedies in the form of an elaborate grievance procedure.

6. Davis had previously sent a letter to Atkins via certified mail advising Atkins that he was recommending to Adams that his employment be terminated. The letter from Davis stated the reasons for his adverse recommendation. *See* Defendants' Exhibit O. Adams incorporated these reasons in his own letter to Atkins. *See* Defendants' Exhibit Q.

days, did not violate his right to due process. *See Panozzo,* 905 F.2d at 138–39 n. 5. (finding no due process violation in municipality's refusal to entertain appeal of discharged employee who was given ten days to request a hearing).

Although this Court readily recognizes that there is *some* value in particular safeguards which could be added to IPS's present notification procedures, when balanced against the Government's interest, the Court must conclude that they are not a requirement of due process and that the notification procedure which IPS followed in this case met the minimum requirements of due process. The Supreme Court has recognized the strong governmental interest "in quickly removing an unsatisfactory employee." *Loudermill,* 470 U.S. at 546, 105 S.Ct. at 1495. Owing to the nature of the risk which an intoxicated school bus driver poses, the state's interest is especially weighty. "The state has an obligation to prevent loss of life and serious injury to those members of the community to whom it has a very special responsibility, the young." *Darryl H. v. Coler,* 801 F.2d 893, 902 (7th Cir.1986). In addition, the fiscal and administrative burdens entailed with any additional procedures would be excessive. To force IPS to provide actual notice of the opportunity for a hearing to those employees faced with discharge would, in essence, be asking a government entity to sacrifice the efficiency of its operations to factors as trivial as the holiday and travel plans of those with whom it has a duty to correspond. It was incumbent upon Atkins to keep IPS apprised of his current mailing address, and he cannot now be heard to complain because his employer sent important correspondence to that address. That he decided to absent himself from his address without furnishing other instructions to IPS, or that his father decided, for whatever reason, to keep the letter to himself, are not factors which warrant modifying IPS's notification procedures. The government has to assume that adults will act responsibly. Requiring IPS to develop policies tailored to the panoply of quirky behaviors available to humans is not a course that this Court can recommend. Atkins's claim that IPS abridged his Fourteenth Amendment rights by denying him a hearing is meritless. By failing to respond within ten days from the date of delivery of the IPS notice, Atkins's waived his right to a hearing. *See Fern v. Thorp Public School,* 532 F.2d 1120, 1131 (7th Cir.1976) (holding that teacher who sought injunction when faced with discharge waived right to hearing); *Field v. Boyle,* 503 F.2d 774, 778 (7th Cir.1974) (finding that judge waived right to a hearing after he declined the opportunity for one); *Suckle v. Madison General Hospital,* 499 F.2d 1364, 1367 (7th Cir.1974) (holding that physician discharged from staff of hospital was not entitled to a hearing because he could not secure a right which he declined when it was voluntarily offered to him). Count II is dismissed.

3. Counts III, IV, V and VI: Due Process and Equal Protection Claims as to Adams, Black and Davis; Breach of Contract Claim as to Adams; and § 1983 Claims as to All Defendants

■ Counts III, IV and V allege that Adams, Black and Davis, respectively, deprived Atkins of due process by terminating him from his employment, or recommending the same, because of his race, and deprived him of equal protection by retaliating against him for refusing to take a drug test, all in violation of 42 U.S.C. § 1983.[7] Count III also alleges that Adams breached Atkins's contract of employment. Count VI sets forth separate § 1983 claims against all the Defendants for violations of rights guaranteed un-

---

7. Although the caption to Atkins's Complaint lists Adams, Black and Davis in their official and individual capacities, the Court will construe the Complaint as only stating claims against Adams, Black and Davis in their individual capacities. The Supreme Court in *Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985), noted that the practice of suing individuals in their official and individual capacities is unneces-

sary: "There is no longer a need to bring official-capacity actions against local government officials, for under *Monell [v. New York Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)], local government units can be sued directly for damages and injunctive or declaratory relief." *Id.,* at 167 n. 14, 105 S.Ct. at 3106 n. 14

der the First, Fifth and Fourteenth Amendments.

To survive the Defendants' motion for summary judgment, Atkins must set forth facts showing the need for a trial. *See Wolf,* 870 F.2d at 1329. A court must enter summary judgment against the nonmoving party if, after adequate time for discovery, the party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Under both Title VII and § 1983, the plaintiff is required to establish that she has been the victim of intentional discrimination. *Bruno v. City of Crown Point,* 950 F.2d 355, 361 (7th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 2998, 120 L.Ed.2d 874 (1992). As the Court has already explained, however, it is at a complete loss as to what evidence, direct or circumstantial, Atkins would present to a jury to prove his discrimination claims. The same is true of his retaliation claims. *See infra.* He has not produced one scintilla of evidence to further his cause, leaving the Court with "no indications of motive and intent supportive of his position" to create an issue of fact for a jury to resolve. *See Friedel,* 832 F.2d at 972, *citing, Munson v. Friske,* 754 F.2d 683, 690 (7th Cir.1985). Summary judgment in favor of the Defendants is appropriate in these circumstances. With the one exception noted below, Counts III, IV, V, and VI are dismissed to the extent that they set forth claims against Adams, Black, and Davis.

■■■ The only viable cause of action against any of the individual Defendants is Atkins's breach of contract claim against Adams in Count III. Under Indiana law, there are two types of employment relationships: (1) employment at will, *see, e.g., Mead Johnson and Co. v. Oppenheimer,* 458 N.E.2d 668, 670 (Ind.App. 1st Dist.1984), and (2) employment for a definite term. *See, e.g., Peterson v. Culver Educational Foundation,* 402 N.E.2d 448, 451 (Ind.App. 1st Dist.1980). When a contract of employment is for a definite term, it may not be terminated prematurely except for cause or mutual agreement, unless the right to do so is expressly provided for in the contract. *See Spearman v. Delco Remy,* 717 F.Supp. 1351, 1356 (S.D.Ind.1989) and cases cited therein; I.L.E. *Employment* § 9.

Atkins's employment contract with IPS was for the 1989–90 school year. Paragraph 14 of the contract gives IPS the right to dismiss Atkins "for cause": "Failure on the part of Driver to comply with the terms of this contract shall be deemed cause for dismissal at the option of the Employer." Defendants' Exhibit Z. The Defendants believe that Atkins's discharge was justified (*i.e.* "for cause") because he refused to take a drug test in violation of Paragraph 6, *supra. Id.* Atkins denies, however, that he ever refused to take the test. *See* Plaintiff's Affidavit, at ¶ 15. If Atkins was in full compliance with the terms of his employment contract at the time he was discharged, then IPS's discharge of him without cause as required in Paragraph 14 would constitute a breach. To make this determination, however, the Court would have to weigh the evidence and evaluate the credibility of witnesses, which is beyond its appointed role at the summary judgment stage. A genuine issue remains whether Atkins refused to take a drug test.

### a. Count VI: § 1983 Claims Against the Board

■■■ Count VI also alleges that the Board terminated Atkins's employment for attempting to enforce rights protected by the First, Fifth, and Fourteenth Amendments to the Constitution of the United States. The Board is a "person" subject to suit within the meaning of 42 U.S.C. § 1983. *See Monell v. Dept. of Social Services,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978) ("Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies."). In *Monell,* the Supreme Court held that municipalities can be held liable under § 1983 for constitutional violations caused by their official policies, including unwritten customs, but they cannot be held liable solely on a theory of *respondeat superior. Monell v. Dep't of Social Services,* 436 U.S. at 691, 98 S.Ct. at 2036. "It is only when the 'execution

of [the]·government's policy or custom ... inflicts the injury' that the municipality may be held liable under § 1983." *Springfield v. Kibbe*, 480 U.S. 257, 267, 107 S.Ct. 1114, 1119, 94 L.Ed.2d 293 (1987) (quotations omitted); *Woods v. Michigan City*, 940 F.2d 275, 277 (7th Cir.1991).

■ The Supreme Court has "repeatedly stressed the need to find a direct causal connection between municipal conduct and the constitutional deprivation." *Springfield v. Kibbe*, 480 U.S. at 267, 107 S.Ct. at 1119. Therefore, to state a claim for municipal liability under § 1983, the plaintiff must not only establish that an alleged constitutional deprivation ensued pursuant to an "official policy" of the municipality, *Tapia v. Greenwood*, 965 F.2d·336, 338 (7th Cir.1992), *citing*, *Pembaur v. Cincinnati*, 475 U.S. 469, 479–80, 106 S.Ct. 1292, 1298–99, 89 L.Ed.2d 452 (1986), the plaintiff must also demonstrate a direct causal link between the municipal policy and the constitutional deprivation. *Id., citing, Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Strauss v. Chicago*, 760 F.2d 765, 767 (7th Cir.1985). "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional. municipal policy, which policy can be attributable to a municipal policy maker." *Tapia*, 965 F.2d at 338 (*citing, Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985)); *see Strauss v. Chicago*, 760 F.2d at 767 (*citing, Powe v. Chicago*, 664 F.2d 639, 650 (7th Cir.1981)).

■ Judged against these standards, the Court concludes that summary judgment must enter in favor of the Board. At the time of Atkins's discharge, the Board had a written policy in its Affirmative Action Plan prohibiting discrimination on the basis of race or sex. This policy is referenced in both the IPS employee handbook and the collective bargaining agreement between IPS and Local 661 of the American Federation of State, County, and Municipal Employees, which represented Atkins. *See* Affidavit of Dr. James Adams, at ¶ 15; Defendants' Exhibits "W–Y". As the Court has already

noted, Atkins has failed to produce evidence of any discriminatory conduct, which presents an insuperable obstacle to a claim based on custom. Nor has he identified an official IPS policy promoting racially or sexually discriminatory conduct.

■ The same kind of deficiency defeats Atkins's retaliation claim: he has failed to identify any protected behavior which caused his discharge. The prima facie case for retaliation requires: (1) a showing that the employee engaged in statutorily protected expression; (2) an adverse action by the employer; and (3) a causal link between the protected expression and the adverse action. *See Johnson v. Sullivan*, 945 F.2d 976, 980 (7th Cir.1991). Although Atkins claims that he engaged in protected expression, the only conduct which he has put at issue concerns the administration of IPS's drug testing policy. Assuming that Atkins refused to take a drug test, this "expression" is not protected for reasons that the Court has already explained. *See Skinner v. Railway Labor Executives Association*, 489 U.S. 602, 619–20, 626–27, 109 S.Ct. 1402, 1414–15, 1418–19, 103 L.Ed.2d 639 (1989); *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). Count VI is dismissed.

### C. *Atkins's Motion to Strike*

Atkins's moves the Court to strike Exhibits A–M of Adams's affidavit. The motion is denied as moot because these exhibits had no bearing on the Court's ruling in this matter. Plaintiff may tender his objections at trial if the Defendants seek the introduction of these exhibits into evidence.

### III. CONCLUSION

For the foregoing reasons, the Defendants' motion for summary judgment is granted in part and denied in part. With the exception of his claim for breach of contract in Count III, the Plaintiff's claims as set forth in his complaint are hereby dismissed. The only issue which remains for trial is whether the Plaintiff refused to take a drug test after IPS so requested.

The Defendants' motion to strike portions of Atkins's affidavit and the exhibits attached to his response brief is granted, and the motion to strike the affidavit of Judith K. Pennington is denied. Atkins's motion to strike the affidavit of Adams is denied.